UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES,

        Plaintiff,

    v.

DWAYNE RICHARDSON,

        Defendant.

No.  CR 23-00196 WHA

**ORDER DENYING MOTION TO DISMISS**

### INTRODUCTION

In this tax-evasion prosecution, defendant taxpayer argues that the government violated his Fourth and Fifth Amendment rights during the course of the civil tax examination that preceded his criminal prosecution.  Defendant now moves to dismiss the prosecution, or in the alternative, to suppress evidence obtained during the civil examination.  For the reasons stated herein, the motion is **DENIED.**

### STATEMENT

The IRS's civil examination and fraud referral procedure is necessary background.  The Internal Revenue Manual (IRM) defines "tax fraud" as "an *intentional* wrongdoing, on the part of a taxpayer, with the specific purpose of evading a tax known or believed to be owing.  Tax fraud requires both: a tax due and owing; and *fraudulent intent*" (IRM 25.1.1.3) (emphasis added).  There are two species of tax fraud:  "*Civil* fraud results in a remedial action taken by the government, such as assessing the correct tax and imposing civil penalties as an addition to tax,"

United States District Court
Northern District of California

while "*criminal* fraud results in a punitive action with penalties consisting of fines and/or imprisonment"  (IRM 25.1.1.3.2).

The IRS enforces our tax laws through two separate investigative divisions:  IRS Criminal Investigation's (IRS-CI) special agents (SAs) are charged with investigating criminal tax violations, while the IRS's civil arm conducts civil tax examinations (or audits) through revenue agents (RAs).  While most examinations begin and end as civil, there are times when, over the course of a civil examination, an RA uncovers evidence of wrongdoing that warrants referral to the IRS-CI for criminal investigation and possible prosecution.

A different set of consequences and concomitant rights and safeguards attach to civil and criminal investigations and their targets.  The transition from civil to criminal within the IRS is therefore an important one, and the IRM provides detailed guidance.

The IRS's fraud development procedure, codified in the IRM, goes as follows.  If "indicators of fraud," sometimes called "badges of fraud" or "*first* indicators of fraud," are uncovered during the normal course of a civil audit, the relevant compliance employee, typically a RA, "must clearly document the potential fraud indicators and initiate a discussion with the compliance employee's group manager" (IRM 25.1.2.2).  If the RA's Group Manager (GM) confirms that the indicators of fraud warrant fraud development, the RA must then contact a Fraud Technical Advisor (FTA) (alternatively called a Fraud Referral Specialist or Fraud Enforcement Advisor) (*ibid*.).  "The [FTA] will be consulted in all cases involving potential criminal fraud, as well as those cases that have potential for a civil fraud penalty" (IRM 25.1.3.2) (emphasis added).  If the RA, GM, and FTA all "agree the *potential* for fraud exists," the RA then prepares, and the GM and FTA approve, "Form 11661, Fraud Development Recommendation," thereby placing the civil audit in "fraud development status" (IRM 25.1.2.2(2)) (emphasis added).

Indicators of fraud "serve as a sign or symptom, or signify that actions *may* have been taken for the purpose of deceit, concealment or to make things seem other than what they are.  Indications, in and of themselves, do not establish that a particular action was taken" (IRM 25.1.1.4).  Example indicators of fraud include "claiming fictitious or substantially

2

overstated deductions," "failure to keep adequate records, concealment of records, or refusal to make records available," "multiple sets of books or no records," and "false statements about a material fact pertaining to the examination" (IRM 25.1.2.3).

Once in fraud development status, "a plan of action (plan) must be formulated as early as possible to develop and document [ ] *affirmative acts of fraud*" (*ibid*.). That plan of action may be affixed to Form 11661 when it is filed. Placement in fraud development status does not alter the civil nature of the audit and does not inevitably augur referral for criminal investigation. It is only if *affirmative acts* of fraud are actually uncovered by the RA that they "must suspend collection or examination activity, and immediately notify the [GM] and the [FTA]" (IRM 25.1.2.2). If criminal criteria are met, the FTA must then recommend a referral to IRS-CI (*ibid*.). It is at this juncture that a civil audit becomes a criminal investigation. If, after an RA's suspension and referral, the FTA determines that criminal criteria have not been met, or the case is returned by the IRS-CI, the RA, GM, and FEA then complete the civil audit, and may consider the civil fraud penalty or other civil punishment (*ibid*.)

*Affirmative acts* (or *firm indicators*) of fraud, which require suspension of the civil audit and criminal referral, "are those actions that establish that a particular action *was* deliberately done for the purpose of deceit, subterfuge, camouflage, concealment, some attempt to color or obscure events, or make things seem other than what they are" (IRM 24.1.1.4). Examples include "deliberate or intentional omission of specific items where similar items are included; concealment of bank accounts or other assets; willful failure to deposit receipts to business accounts; and covering up sources of receipts" (*ibid*.).

To recap: indicators (or *first* indicators) of fraud trigger outreach to an FTA and placement into fraud development status, an internal status intended to facilitate further investigation and the development of affirmative acts of fraud by the *civil* examination team. The discovery of affirmative acts (or *firm* indicators) of fraud requires an RA to suspend the civil examination and refer the matter to the FTA for evaluation and referral to IRS-CI.

In the case at hand, in October of 2019, the IRS selected defendant's 2017 tax return for a civil examination (Dkt. No. 34-1 at 1). Defendant's returns were selected due to the presence of

United States District Court
Northern District of California

"large, unusual, and questionable" (LUQ) items.  The examination would eventually expand to the 2017 – 2019 period, during which defendant claimed several hundred thousand dollars of medical-expense deductions.  Revenue Agent Ryan Schutz was assigned to the examination in June of 2020.  On July 30, RA Schutz sent defendant a letter notifying him of the examination of his returns (*id*. at 2).  That notice was accompanied by an Information Document Request, IRS Publication 1 (the "Taxpayer Bill of Rights") and IRS Notice 609 ("Privacy Act Notice") (*ibid*.).  Notice 609 stated that any information given to the IRS may be shared with "the Department of Justice to enforce the federal civil *and criminal tax laws*, and to other federal agencies as provided by law."

On August 7, RA Schutz spoke with Deborah Marion, a CPA retained by defendant as his power of attorney (Dkt. No. 34-1 at 2).  A power of attorney (POA) is an individual authorized by the taxpayer to represent them before the IRS in connection with a federal tax matter.  That individual can, but need not be, an attorney.  As with POA Marion, they may be CPAs or other agents eligible to practice before the IRS.  During a second call on August 19, RA Schutz asked POA Marion for documents supporting defendant's medical expenses, and POA Marion stated that defendant had "bad recordkeeping" and had decided not to claim deductions for medical expenses or charitable contributions in the years at issue (*ibid*.).  POA Marion claimed that the medical costs stemmed from a prior appendectomy that defendant was still paying off in the years under examination (*ibid.*).

On August 21, RA Schutz spoke with his Group Manager, Nicole Hall, regarding "potential indicators of fraud," and the two set up a meeting with the relevant FTA, Esther Robinson (*id*. at 3).  That meeting occurred on August 25, and FTA Robinson recommended, based on the "facts of the case and potential indicators of fraud," that the audit be placed in fraud development status, and that RA Schutz interview defendant directly, because POA Marion was unlikely to have firsthand knowledge of the years under audit (*ibid*).  RA Schutz completed and circulated Form 11661 on August 26, intending to place the audit in fraud development status.  However, a mix up with the version of the form, not discovered and corrected until December, delayed the examination's formal placement into fraud development until that time.  The delay

in formal placement into fraud development status did not hinder RA Schutz's pursuit of the examination.

On August 26, RA Schutz conducted his first interview with defendant and POA Marion. Defendant stated that the bulk of his claimed medical expenses stemmed from an appendectomy some time before 2012, and that those costs led to his bankruptcy in that year (Dkt. No. 34-5 at 11). Defendant further noted that his brother helped him prepare his taxes using H&R Block preparation software, and that his brother had advised him that he could "break up" and claim his prior medical expenses over the course of subsequent years in order to gain a tax benefit (*id.* at 12).

On September 11, POA Marion emailed RA Schutz bankruptcy paperwork and personal loan documents. (Dkt. No. 34-1 at 3-4). This was defendant's first and last production of documents prior to the criminal referral and suspension of the audit.

RA Schutz, POA Marion, and defendant held a follow-up meeting on September 17 (*id.* at 4). During the meeting, defendant stated that his own research, not his brother's advice, led him to believe that he could deduct medical expenses in years other than that in which the expense occurred, though he recollected talking to his brother about the topic (Dkt. No. 34-7 at 3-4). Defendant did not provide any statements to the IRS after this date. As a result, the time period of interest here is the three-week span between August 25 and September 17, after which no statements or documents were received by the IRS.

Nevertheless, the civil examination continued through the remainder of the year: RA Schutz made several unsuccessful requests for further documents, spoke with defendant's POAs over email and phone, continued to apprise FTA Robinson of his progress, and so forth.

On January 15, 2021, RA Schutz, GM Hall, FTA Robinson, and counsel met to discuss defendant's file, and counsel stated that "the facts presented a strong case for assertion of the fraud penalty" (Dkt. No. 34-1 at 5). On February 8, RA Schutz began to work on Form 2797 ("Referral Report of Potential Criminal Fraud Cases") and completed the criminal referral on February 26 (*id.* at 6). RA Schutz did not work on the civil audit after beginning Form 2797 (*ibid*).

United States District Court
Northern District of California

5

IRS-CI accepted the referral, and defendant ended up being indicted.  Defendant now argues that the referral of his case to IRS-CI was improperly delayed, and that RA Schutz misled him and continued to accumulate testimony and documents intended for a criminal prosecution under the guise of a civil audit (Dkt. No. 26 at 2).  Defendant further asserts that RA Schutz had uncovered firm indicators of fraud by August 25, 2020, and should at that moment have suspended his civil audit and made the referral to IRS-CI.  RA Schutz's failure to do so, he argues, violated his Fourth and Fifth Amendment rights, warranting dismissal or, in the alternative, suppression (*ibid*).

While the civil examination persisted for nearly a year, this order necessarily focuses on the span of three weeks between August 25, 2020, (when defendant argues the IRS should have ceased its civil examination and made a criminal referral) and September 17, 2020, (the date of defendant's last statement to the IRS).

This order follows two rounds of briefing and oral argument.

## ANALYSIS

Defendant argues that the IRS violated both his Fourth and Fifth Amendment rights over the course of the civil examination.  He also argues that four separate fact disputes necessitate an evidentiary hearing.  This order addresses each argument in turn.

### 1. DEFENDANT'S FOURTH AMENDMENT CLAIM.

In tax cases, "a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent." *United States v. Robson*, 477 F.2d 13, 17 (9th Cir. 1973).  It is beyond cavil that "the failure of an IRS agent . . . to warn a taxpayer that [a civil] audit may have potential criminal ramifications does not render the search unreasonable." *Id*. at 17-18.  Defendant must produce "clear and convincing evidence of an actual deception or trickery on the part of the Government" by way of an "*affirmative* misrepresentation." *United States v. Bridges*, 344 F.3d 1010, 1020 (9th Cir. 2003) (emphasis added).

Defendant has failed to meet that burden.  As an initial matter, it is undisputed that the IRS mailed defendant a copy of Notice 609 alongside their initial letter informing him of the civil

United States District Court
Northern District of California

examination (Dkt. No. 26-1 at 4, 17-18).  Notice 609 disclosed that the IRS "may give the information [provided by defendant] to the Department of Justice to enforce the federal civil and criminal tax laws, and to other federal agencies as provided by law."  Moreover, the record does not show that defendant at any point inquired into the possibility of criminal referral, or that RA Schutz or any other IRS employee at any point made an *affirmative* misrepresentation disclaiming the possibility of criminal referral.

Defendant instead points to a December 2020 email exchange between his power of attorney, Candace Smith, and RA Schutz, wherein Smith stated that defendant "understands that he was incorrect in understanding his research on deductions and now just wants to start dealing with the consequences," and asked Schutz when a final decision could be expected (Dkt. No. 26-1 at 63).  In response, RA Schutz offered defendant the option to begin pre-assessment payments, but POA Smith declined (*id*. at 62).  Defendant argues, on the basis of the above exchange, that "*[d]espite the fraud referral*, RA Schutz continued to interact with [defendant's] POAs as if they were working toward the end of a civil investigation . . . . [RA Schutz] continued to request information and interviews as if nothing had changed.  When, in December of 2020, POA Smith asked when the audit would be concluded so that [defendant] could start to make payments, RA Schutz said nothing to correct her mistaken impression" (Dkt. No. 26 at 14).  Defendant's reference to a "fraud referral" refers to the placement of the audit into "fraud development status," which is discussed in detail below.  In sum, fraud development status is an *internal* marker employed by civil auditors, which precedes a criminal referral *but does not itself compel such a referral*.  While in "fraud development status," an audit remains civil in nature.

Defendant's argument fails on two fronts, the first legal, the second metaphysical.

*First*, RA Schutz did not make an *affirmative* misrepresentation regarding the possibility of criminal referral, he merely engaged in a discussion of a civil resolution.  Defendant's grievance is that, during the course of that discussion, "RA Schutz said nothing to correct [POA Smith's] mistaken impression" (Dkt. No. 26 at 14).  In short, he was not obligated to.  While the government cannot make *affirmative misrepresentations* regarding the possible criminal consequences of an investigation, they have *no affirmative duty* to correct erroneous, unstated

United States District Court
Northern District of California

assumptions made by a defendant. *See United States v. Stringer*, 535 F.3d 929, 940 (9th Cir. 2008). "Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading." *Robson*, 477 F.2d at 17–18 (emphasis added) (internal quotation omitted). In *Stringer*, where the SEC and USAO *were* in fact conducting parallel civil and criminal investigations, an SEC attorney made sure that, during a civil deposition, the court reporter did not reveal the then-confidential USAO investigation to the defendant, and when asked by defense counsel about the involvement of the USAO, stated that "it is the agency's policy not to respond to questions like that, but instead, to direct you to the other agencies you mentioned." *Stringer*, 535 F.3d at 935. Our court of appeals held that this did not justify dismissal or suppression because the SEC "made no *affirmative* misrepresentation." *Id*. at 940 (emphasis added). Here, of course, there was no parallel criminal investigation, *there was no inquiry* by the defendant, and there was no disclaimer of later criminal referral by the IRS.

Defendant next points to *United States v. Tweel*, a Fifth Circuit decision often cited by our own court of appeals. 550 F.2d 297 (5th Cir. 1977). In *Tweel*, the audit of defendant was conducted at the specific request of the Organized Crime and Racketeering Section of the Department of Justice, and when the defendant's accountant asked if a "special agent" was involved in the investigation, the RA replied "no." *Id*. at 299. The court found that this affirmative denial, in light of the "obvious criminal nature of this investigation was a sneaky deliberate deception." *Ibid*. Those facts are inapposite. Here, defendant's audit was civil in origin and civil in nature at the time of the communications. Defendant never inquired regarding the involvement of a special agent or the possibility of criminal consequences, and RA Schutz never affirmatively disclaimed either.

At bottom, defendant's argument asks that a revenue agent's active pursuit of a civil resolution to a *then civil audit* be deemed an "affirmative" representation regarding the foreclosure of later criminal referral. That outcome would upend the long-extant practice of criminal referral *in toto* and is rejected.

United States District Court
Northern District of California

8

*Second*, the discussion between RA Schutz and POA Smith occurred in *December* of 2020. Recall, defendant provided statements to the IRS on two occasions, August 26, and September 17, 2020, and provided a single batch of documents on September 11, 2020 (Dkt. No. 34-1 at 4). Given the linear nature of time, statements made in December could not possibly have tricked defendant into producing documents and sitting for interviews, even if RA Schutz's December emails *did* contain affirmative misrepresentations, which they did not.

The remainder of defendant's Fourth Amendment arguments are grounded in the IRS's alleged violations of its own Internal Revenue Manual. "[C]ourts are uniformly of the view that internal rules of agency procedure confer no substantive rights on taxpayers." *Crystal v. United States*, 172 F.3d 1141, 1148 (9th Cir. 1999). The Fourth Circuit's *Groder v. United States* decision, cited by our court of appeals in *Crytal*, explained that "[t]he violation of a guideline such as [IRM 25.1.2.2] is thus, by itself, without legal effect to quash a summons or to suppress evidence at a criminal trial. In order to prevail, a taxpayer must show more than a mere violation of the Internal Revenue Manual. He must show that the government proceeded against him in bad faith." *Groder v. United States*, 816 F.2d 139, 142 (4th Cir. 1987); *see Crystal*, 172 F.3d at 1148 (declining to infer bad faith on part of IRS auditors where "the only basis for inferring bad faith [was] the mere fact that internal procedures were not followed"). Defendant has failed to make that showing.

*First*, defendant argues that the IRS tricked him when it "deliberately bypassed" his representative – then POA Marion – and "interviewed [him] not once but twice, and [] without the representative being in the middle as a buffer," in contravention of the IRS "Taxpayer's Bill of Rights." Not so. The record shows, and defendant concedes, that POA Marion was in fact present during each of defendant's two interviews conducted on August 26 and September 17, 2020 (Dkt. No. 34-1 at 3-4). Further, the only documents produced to the IRS, on September 11, 2020, were produced through defendant's representative (*ibid*). Nor does the record suggest that the IRS engaged in a bad faith, albeit unsuccessful, attempt to sideline defendant's representative.

United States District Court
Northern District of California

At oral argument, defendant's counsel retreated, and stated that "because of the way that [the interviews were] set up, the client was tricked into believing that he had to talk directly and not through his representative." Asked to identify statements or documents supporting that conclusion, counsel could not. Counsel instead retreated further and stated that defendant's representative was at the time of the interview facing difficult personal circumstances, that "her mind was not on the case," and that "that was unfair to [defendant]." As evidence, defendant points to the fact that, during the phone call with defendant and POA Marion, the IRS asked defendant questions directly, rather than pose each question to POA Marion. No decision has held that questioning a taxpayer in the *presence* of their power of attorney but not *through* that power of attorney constitutes bad faith. Moreover, and while this order declines to pass judgment on the performance of defendant's representatives, *if* they failed to perform to the satisfaction of defendant, they alone bear responsibility for that failing. It cannot be imputed to the government.

*Second*, defendant argues that the IRS acted in bad faith when it delayed the filing of Form 11661, which serves to place an audit into fraud development status. On August 26, RA Schutz completed the form and forwarded it to GM Hall, who in turn forwarded it to FTA Robinson (Dkt. No. 49-2 at 2). The version of the form RA Schutz used was outdated, and it was not until December 22, 2020, that FTA Robinson secured and signed a corrected version of the form. Defendant argues that those three "delayed following their own procedures in order to obtain admissions contrary to [defendant's] rights." "The longer they delayed that, the more demands for information they put out there."

This argument fails because it rests on an incorrect premise, namely that the failure to timely file Form 11661 enabled the civil audit team to pursue otherwise restricted avenues of investigation. As stated above and below, fraud development status is merely an internal designation intended to facilitate the tracking of a potential fraud case. Form 11661 does not effectuate a criminal referral or otherwise foreclose on the civil audit team's continued work on the examination. Placement into fraud development status does not mean that an audit will necessarily be referred to the criminal division. It may be resolved with a civil fraud penalty, or

United States District Court
Northern District of California

no penalty at all, depending on the audit's ultimate findings. In sum, the timely filing of Form 11661 on August 26, 2020, would not have foreclosed upon the investigation that the IRS ultimately pursued.

Defendant next asserts that the delay in filing Form 11661 (and thus formal placement into fraud development status) expanded the window of time within which the IRS could conduct its civil investigation. That argument also fails. True, the IRM requires "timely action . . . on all cases in fraud development status," but that broad temporal limitation is not relevant here (IRM 25.1.2.2(8)). Defendant produced documents on September 11 (two weeks after August 26) and sat for his final meeting with the IRS on September 17 (three weeks after August 26). Moreover, the "action plan" appended to the August 26 Form 11661, which defendant argues should have been completed correctly and filed immediately, projected document requests, summonses, and meetings as far out as November 28, 2020. The prompt filing of the August 26 version of Form 11661 would not have foreclosed upon any of the subsequent investigative efforts pursued, or the documents and interviews actually provided. "[C]arelessness is different from bad faith." *Crystal*, 172 F.3d at 1148. The bungling of an administrative formality – and one that did not prejudice defendant – does not support suppression.

*Third*, defendant argues that the civil audit team deceived him because they had firm indicators of fraud in hand on August 25 but refused to make the necessary criminal referral, instead building a criminal case under the guise of a civil audit. The so-called "firm indications of fraud rule" has been used as a "benchmark for determining whether the IRS has attempted to conduct a criminal investigation under the guise of a civil audit." *United States v. Peters*, 153 F.3d 445, 452 (7th Cir. 1998). The government is correct that our court of appeals has never found bad faith on the basis of the rule. Nevertheless, it has considered the argument, citing to the rule's application by the Fourth Circuit in *Groder v. United States*. *Crystal* 172 F.3d at 1149; *Groder v. United States*, 816 F.2d 139 (4th Cir. 1987). This district has also previously considered, but denied, the argument. *United States v. Kim*, No. CR 10-00171 RS, 2010 WL 3490228 (N.D. Cal. Sept. 3, 2010) (Judge Richard Seeborg). It is therefore considered here.

The Internal Revenue Manual requires that, "if affirmative acts of fraud are established . . . [t]he compliance employee must suspend collection or examination activity, and immediately notify the group manager and the FEA," who must in turn recommend a criminal referral to IRS-CI if criminal criteria are met (IRM 25.1.2.2(9)).  If, contrary to the IRM's dictate, no criminal referral is made and the civil audit continues, then a court may conclude that the IRS conducted a criminal investigation under the guise of a civil audit, thereby misrepresenting the nature of their investigation and deceiving the taxpayer.  *Groder*, 816 F.2d at 142; *Peters*, 153 F.3d at 451-52.  As with any argument grounded in an agency's violation of internal procedure, suppression is justified only if that violation supports the conclusion that the government proceeded against the defendant in bad faith.  *Crystal,* 172 F.3d at 1149.

This argument turns on the distinction between *indicators of fraud* (or "*first* indicators") and *affirmative acts of fraud* (or "*firm* indicators"), defined above.  Recall, per the IRM, indicators of fraud trigger an audit's placement into fraud development status, an internal marker used by the IRS's civil division to track the continued development of potential fraud over the course of a civil examination.  Affirmative acts, meanwhile, require the suspension of the civil examination and referral to the FTA for criminal referral to IRS-CI (IRM 25.1.2.2(9)).  While there is no bright line between indicators of fraud and affirmative acts of fraud, the IRM distinguishes between the two based on their evidentiary impact as to the taxpayer's intent: while first indicators "signify that actions *may* have been taken for the purpose of deceit," affirmative actions "establish that an action *was* deliberately done for the purpose of deceit" (IRM 24.1.1.4).  The distinction is an important one.  "A firm indication is something different from a first indication or a mere suspicion that intentional fraud exists.  If a firm indication is taken to mean the same thing as a mere suspicion, taxpayers would be subject to fraud investigations as a matter of course, and the revenue agent would have to cease almost before he started his investigation."  *Groder*, 816 F.2d at 143 (internal quotation marks omitted).  "[T]he individual revenue agent and his supervisors enjoy latitude in making the difficult referral decision. They also deserve deference from a reviewing court.  Federal judges, after all, are not revenue agents."  *Id*. at 142-143 (internal quotation and citation omitted).

12

United States District Court
Northern District of California

The IRS did not possess affirmative acts of fraud on August 25, was not required to suspend its civil examination, and consequently did not trick or deceive defendant by continuing its civil examination beyond that date. On that date, in defendant's view, the IRS possessed the following "firm" indicators: "a clear pattern of escalating medical expenses," "statements from POA Marion indicating that there were no records to support these expenses, and that [defendant] no longer wished to claim them," and the fact that defendant's bankruptcy would have resulted in the discharge of defendant's medical debts (Dkt. No. 26 at 13-14; Dkt. No. 45-1 at 4). The IRS, however, did not learn of defendant's bankruptcy until August 26: it is therefore irrelevant to defendant's assertion that firm indicators existed on August 25. In any event, the above, taken together, do not constitute affirmative acts of fraud. On that date, the possibility remained that defendant simply had "bad recordkeeping," as claimed by POA Marion, or had otherwise acted without a deliberate intent to deceive (Dkt. No. 34-1 at 2). Indeed, on August 25, FTA Robinson recommended that RA Schutz interview defendant to "[f]ind out if he prepared [the returns] himself, what he knew about tax preparation, why he deducted the expense," and whether he had any medical expenses, revealing the team's general uncertainty as to intent (Dkt. No. 47-1 at 18).

True, it is likely that on August 25 the civil audit team believed that defendant's deductions were in error. But affirmative acts of fraud are not merely facts that suggest that defendant has made an error, they are "those actions that establish that a particular action *was deliberately done for the purpose of deceit, subterfuge, camouflage, concealment*" (IRM 24.1.1.4) (emphasis added). They speak to *intent*, not merely the existence of a wrongdoing. A criminal referral is therefore typically not appropriate "until an explanation is given by the taxpayer and the IRS can determine whether the explanation is credible." *United States v. Dilworth*, No. CRIM. 10-730 JBS, 2012 WL 1390222, at *9 (D.N.J. Apr. 20, 2012) (Judge Jerome Simandle). In *United States v. Kim*, for example, an audit of the defendant and his small business revealed $394,000 in unexplained bank deposits, five undisclosed bank accounts where business receipts had been deposited, and claims of a family loan totaling some $200,000 (without supporting documentation) intended to legitimize otherwise unexplained deposits.

13

2010 WL 3490228, at *1. *Kim* denied suppression because there were no firm indications that Kim's conduct was potentially criminal until the RA reviewed all the evidence supporting the defendant's business receipts and expenses: "Up to that point, the possibility remained that Kim was simply a poor bookkeeper." *Id*. at 4. The same is true here.

In response, defendant asserts that FTA Robinson "knew," on August 25, that "clear and convincing evidence of fraud" existed because she determined that defendant's 2017 tax return was not time-barred due to the applicability of the "fraud statute's" expanded statute of limitations, and instructed RA Schutz to refrain from closing out the examination of that year. However, the record shows that FTA Robinson merely advised RA Schutz to "*[c]onsider opening prior years under a fraud statute if relevant (to be considered once more information is known)*" (Dkt. No. 47-1 at 18) (emphasis added). In this instance, the decision to maintain otherwise time-barred examinations pending further investigation did not constitute a determination that fraud in fact *did* exist, only that fraud may yet be established "once more information is known" (*ibid*).

Defendant further argues that "[e]ven after the case was formally placed in *fraud development status* [here meaning August 26], RA Schutz continued to use the civil audit process for several more months to obtain additional documents and to continue to elicit self-incriminating statements from Mr. Richardson without interference from an attorney" (Dkt. No. 26 at 12) (emphasis added). But that did not constitute a violation of the IRS's internal guidelines. Fraud development status is an internal marker applicable to *civil* examinations. Placement into fraud development status is appropriate where the civil examination team determines that "the *potential* for fraud exists" (IRM 25.1.2.2) (emphasis added). Once a civil examination is in fraud development status, the *civil* examination team (RA, GM, and FTA) is required to develop an "action plan" that "outline[s] the steps required to establish affirmative acts (firm indications) of fraud" (IRM 25.1.2.2) (emphasis added). That plan typically takes the form of further document requests and meetings with the taxpayer, as it did here. Nor is the IRS required to disclose placement into fraud development status to the taxpayer.

14

In summary, defendant has identified instances where the IRS did not effectuate its policies with alacrity and exactness. Our court of appeals has long declined to extend a rule "well-grounded in deliberate deception with serious consequences to the taxpayer" to instances of mere "negligence or recklessness." *Crystal*, 172 F.3d at 1149. Even where defendant has shown some violation of the IRM, those shortcomings were not the product of bad faith and do not constitute "clear and convincing evidence of an actual deception or trickery on the part of the Government." *Bridges*, 344 F.3d at 1020. Moreover, as stated above, the critical period here spanned just three weeks, from August 25 to September 17. In reading defendant's motion, it is easy to come away with the impression that statements and documents were extracted from the taxpayer through the end of the year and beyond, all while the IRS dawdled with the wrong forms and otherwise delayed matters. The hard fact, however, is that the last statement was taken on September 17, and the last documents received on September 11.

### 2. DEFENDANT'S FIFTH AMENDMENT CLAIM.

While defendant's motion alleges that both his Fourth and Fifth Amendment rights were violated by the IRS, the latter argument receives short shrift (Dkt. No. 26 at 2). Defendant's briefing folds the Fifth Amendment issue into the Fourth Amendment test addressed above, arguing that "[t]he government's effort to impose a Fifth Amendment analysis on this case is misleading" because "[t]he issue is whether Mr. Richardson was tricked into giving consent to be interviewed" (Dkt. No. 48 at 1). The argued-for result is again that "[t]he IRS' [*sic*] bad faith manipulation of its own rules invalidated any so-called consent" (*ibid.*).

As presented, defendant's Fifth Amendment claim fails for the reasons stated above.

Moreover, defendant provides no authority for the proposition that his Fifth Amendment claim is, in this instance, subject to the above Fourth Amendment analysis. True, the Fourth Amendment may, in some circumstances, serve to exclude statements made by a defendant. *See Silverman v. United States*, 365 U.S. 505, 81 S. Ct. 679, 5 L. Ed. 2d 734 (1961) (holding conversations inadmissible where police impermissibly usurped portion of petitioner's home to install microphone). But the facts of the *Silverman* line of cases are far removed from our own, and neither the Supreme Court nor our court of appeals have rendered a decision exactly on

15

point. However, in circumstances on all fours with those here, the Seventh Circuit rejected the Fourth Amendment analysis proffered by defendant and instead applied the traditional Fifth Amendment test to a revenue agent's interview with a taxpayer. *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises."). For that reason, this order addresses defendant's statements under the usual Fifth Amendment framework, even if his briefing does not.

Defendant concedes that his interviews were non-custodial, rendering *Miranda* inapplicable (Dkt. No. 48 at 1). *Beckwith v. United States*, 425 U.S. 341, 348 (1976) ("the [*Miranda* decision] squarely grounded its holding on the custodial aspects of the situation, not the subject matter of the interview"). Nor was defendant represented by counsel at the time of the interviews. *Massiah v. United States*, 377 U.S. 201 (1964) (requiring suppression of incriminating statements elicited from defendant in the absence of retained counsel). The proper standard is therefore voluntariness, under which "[c]onfessions or other admissions obtained in the course of an interrogation are deemed involuntary and therefore inadmissible only if they are procured by threats or promises." *Kontny*, 238 F.3d at 817; *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (1988). The record contains neither.

Either way, then, defendant has failed to make out a Fifth Amendment violation justifying suppression.

### 3. DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING

"A hearing is not required on a motion to suppress if the grounds for suppression consist solely of conclusory allegations of illegality. An evidentiary hearing must be held only when the moving papers allege facts which are sufficiently definite, clear, and specific to enable the trial court to conclude that contested issues of fact exist." *United States v. Ramirez-Garcia*, 269 F.3d 945, 947 (9th Cir. 2001) (citations omitted).

Defendant identifies four broad issues he hopes to resolve by means of an evidentiary hearing: "[1] when the agents had firm indicators of fraud, [2] what representations were made

United States District Court
Northern District of California

16

United States District Court
Northern District of California

to Mr. Richardson's team, [3] to assess the credibility of the civil audit team, and [4] to determine whether they acted in bad faith" (Dkt. No. 48 at 6).

The first and last issues raised need not be addressed at length: they are legal questions, not contested issues of fact. There is otherwise no need for an evidentiary hearing because the interactions between the IRS and the taxpayer are all within the knowledge of defendant and his representatives, who necessarily received any representations made by the IRS. Those facts fail to show a constitutional violation as to the statements made and documents provided in the three-week period at issue. An evidentiary hearing would be nothing more than a fishing expedition.

## CONCLUSION

Defendant has not shown that he was affirmatively mislead and has certainly not done so via clear and convincing evidence. Suppression is not warranted. Further, while defendant has styled his motion as a "motion to dismiss," it is unclear that dismissal is ever an appropriate remedy in this context. Because defendant's motion fails, this order does not reach that question.

For the foregoing reasons, defendant's motion is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 7, 2024

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

17