UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DWAYNE RICHARDSON,<br><br>Defendant. | No. CR 23-00196 WHA<br><br>**ORDER DENYING DEFENDANT'S RULE 29 MOTION, DENYING DEFENDANT'S RULE 33 MOTION, AND DENYING DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING** |

**INTRODUCTION**

A jury convicted defendant on three counts of tax-related offenses. He now moves for judgment of acquittal under Rule 29, and, alternatively, for a new trial under Rule 33. He has also moved, separately, for an evidentiary hearing. For the reasons stated below, all three motions are **DENIED**.

**STATEMENT**

In June 2023 a grand jury indicted defendant Dwayne Richardson on three counts of tax evasion in violation of 26 U.S.C. Section 7201. In September 2024, after a three-day trial, a jury convicted defendant on all three counts. He now moves for a judgment of acquittal under Rule 29, and, alternatively, a new trial under Rule 33. He has also requested an evidentiary

hearing.  This order follows full briefing, oral argument, and the examination of two IRS Special Agents.

## ANALYSIS

### 1.   DEFENDANT'S RULE 29 MOTION.

Defendant moves for a judgment of acquittal on all counts pursuant to Rule 29, arguing that the evidence at trial was not sufficient to support the jury's guilty verdict.  "In deciding whether there was sufficient evidence to convict [defendant], 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The jury found defendant guilty on three counts of tax evasion in violation of Section 7201 (Dkt. No. 106).  "A person may violate § 7201 in two ways: (1) by evading the *assessment* of taxes or (2) by evading the *payment* of taxes."  *United States v. Orrock*, 23 F.4th 1203, 1206-07 (9th Cir. 2022) (internal quotation marks, citations omitted).  A conviction under either theory requires the government to show (1) "the existence of a tax deficiency," (2) "willfulness," and (3) "an affirmative act of evasion or affirmative attempt to evade."  *Id*. at 1207.  Here, the government argued that defendant evaded the assessment of tax by claiming fictitious medical expenses on his 2017, 2018, and 2019 tax returns.  The final charge to the jury provided that the government must prove, as to each year in question, that (1) "defendant owed more federal income tax for the calendar year [ ] than was declared due on the defendant's income tax return for that calendar year," (2) "defendant knew that more federal income tax was owed than was declared due on the defendant's income tax return," (3) "defendant made an affirmative attempt to evade or defeat such additional tax," and (4) "[i]n attempting to evade or defeat such additional tax, the defendant acted willfully" (Dkt. No. 103 at 8).  Viewed in the light most favorable to the prosecution, the evidence admitted at trial supported the jury's finding that each element was proven beyond a reasonable doubt.

*First*, defendant's tax returns showed that he deducted $285,000 (2017), $260,000 (2018), and $595,000 (2019) in medical expenses, for a total of $1,140,000 across the three years at issue (TX 7 at 24; TX 8 at 16; TX 9 at 23). During the civil audit of his returns, defendant claimed that those deductions related to a 2010 appendectomy performed at a Sutter Health hospital, California Pacific Medical Center (CPMC). George Hollcraft, a Sutter Revenue Cycle Liaison, testified that defendant was billed about $4,700 for his appendectomy (TX 149-151, 153, 154). IRS-CI Special Agent (SA) Cas Mar, meanwhile, testified that defendant's insurance records reflected a *total* cost-to-patient of $4,924.71 (TX 157). CPMC ultimately forgave defendant's $4,700 bill as "charity care," meaning that defendant's appendectomy set him back about $200 — not $1,140,000, as he would later claim on his tax returns and during the subsequent audit.

SA Mar testified that he then used defendant's bank records (TX 35-37, 185, 159, 161) and insurance bills (TX 177) to recalculate defendant's actual medical expenses, and corresponding tax liability, for all three years (TX 172, 173, 174). In each year, SA Mar testified, defendant owed more federal income tax than was declared on his return. Revenue Agent (RA) Ryan Schutz testified that defendant's medical deductions dramatically reduced his effective tax rate. The above supported the jury's finding that defendant owed more federal income tax for the calendar years 2017, 2018, and 2019 than was declared due on his income tax returns for those years.

*Second*, the above record supported the jury's finding that defendant knew that he owed more federal income tax than what he declared on his returns. A reasonable jury could find, based on defendant's tax returns, hospital invoices, insurance bills, and bank statements, that he knew that he did not incur anything close to the $1,140,000 in deductible medical expenses he claimed, and that those false deductions served to reduce his tax liability.

*Third*, the evidence at trial supported the jury's finding that defendant made an affirmative attempt to evade or defeat the additional taxes due. "[F]iling a false and fraudulent return . . . is sufficient to satisfy the affirmative act requirement." *United States v. Hamilton*, 620 F.2d 712, 717 (9th Cir. 1980). Defendant did just that in each year in question. He then

3

doubled down during his civil audit: RA Schutz testified that during defendant's 2020 audit, he asserted that he had actually incurred the claimed medical expenses, but that he could not locate evidence of those expenses due to poor recordkeeping. CPMC's billing records, defendant's own banking and insurance records, and the testimony of Sutter's revenue employee Hollcraft and SA Mar showed those claims to be false. The jury further heard that defendant provided RA Schutz with multiple, conflicting accounts as to why he believed that he could deduct medical expenses from 2010 in the 2017, 2018, and 2019 tax years, pointing first to his brother, then to his own online research. Implicit in defendant's shifting claims of faulty tax advice was, again, the false notion that the claimed medical expenses were actually paid at some earlier time. They were not. Each of the above, individually and together, supported the jury's finding.

*Finally*, the evidence supported the jury's finding that defendant acted willfully. The evidence above — including the absence of any substantial medical expense and defendant's affirmative misrepresentations both in his tax returns and during the subsequent civil audit — supported a finding of willfulness. By the tax years in question, defendant had paid no more than a few hundred dollars toward the 2010 appendectomy, yet he claimed egregious deductions totaling over a million dollars. The jury further heard from defendant's power of attorney (POA), Constance Smith, who testified that defendant, asked why he had made the medical deductions in question, stated: "Well I didn't get caught the first year, so I thought it was all right."

In sum, the evidence at trial supported the jury's verdict as to each element of the crime, for each year in question.

Defendant's counters fall short.

*First*, defendant argues that Section 7201 "contemplates an *escape* from tax," while the evidence showed only that defendant attempted to secure a "*postponement* of disclosure or payment" (Dkt. No. 112 at 4). In support, he asserts:

> In the present case, the amount of medical expenses claimed by Mr. Richardson was substantial compared to his income. No reasonably intelligent person would have expected to get away

4

> with these deductions in the long term. The government introduced Mr. Richardson's resume which shows him to be an intelligent and educated man. Clearly, he could not have expected to delay payment of these taxes forever. The evidence in this case does not show that Mr. Richardson acted to defeat or evade his taxes. It shows only that he acted to postpone them, thus, the evidence is insufficient to support the convictions.

(*id*. at 4-5). In other words, the crime was so egregious that he could not possibly have expected to get away with it and must have expected to eventually have to pay up.

That argument fails.

As an initial matter, defendant misunderstands the relevant legal standard. The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Riggins*, 40 F.3d at 1057 (internal quotation marks omitted). It is not enough that a different, countervailing conclusion could be drawn from the facts. Nor is it clear that defendant's education and intelligence militated against the jury's verdict. The argument that something about defendant's particular background rendered the formation of the necessary intent impossible is left undeveloped. The general contention, meanwhile, that "[n]o reasonably intelligent person would have expected to get away" with tax evasion, is false. Countless individuals have been convicted of, or pled guilty to, violations of Section 7201. A great many were no doubt "reasonably intelligent."

*Edwards v. United States*, on which defendant's argument hinges, does him more harm than good. 375 F.2d 862 (9th Cir. 1967). In *Edwards*, the defendant was found guilty on seventeen counts of attempt to evade or defeat tax under Section 7201 following a bench trial. There, "[a]ppellant's troubles with his trust account led him to prepare tax returns, collect the amount of tax due *and then fail to file the return or make the payment*." *Id*. at 865. In *Edwards*, the evidence showed that the defendant's "purpose was to take advantage of the time lag in Government investigation of delinquent returns to tide him over during a period of personal financial hardship. *Nothing in the record would suggest that he ever intended the permanent evasion of any of his clients' taxes*." *Id*. at 867. There, the defendant *failed to file a*

1  *return*. Here, meanwhile, the evidence showed that defendant elected, on three separate
2  occasions, *to file a fraudulent one*.
3  As *Edwards* explained, any "affirmative willful act which *in any manner* serves the
4  purpose of evasion is *all* that is required." *Ibid*. (emphasis added). Filing a fraudulent tax
5  return, as here, is enough. Making affirmative misrepresentations to the IRS during a
6  subsequent civil audit, as here, is also enough. Each affirmative, willful act, considered
7  together or alone, served to evade the assessment of tax and brought defendant's conduct
8  within the ambit of Section 7201.
9  *Second*, defendant argues that the evidence was insufficient to show that he acted
10 willfully:

> Mr. Richardson stated he was given bad advice by his brother and that he got tax information from a website. The government presented no evidence to disprove either of these statements by Mr. Richardson, therefore, the government failed to prove beyond a reasonable doubt that Mr. Richardson did not hold a good faith belief that he was complying with the law.

15 (Dkt. No. 112 at 5). As above, the existence of some countervailing evidence does not change
16 the fact that, when "viewing the evidence in the light most favorable to the prosecution," a
17 "rational trier of fact could have found the essential elements of the crime beyond a reasonable
18 doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (internal quotation
19 marks omitted). The trial judge, moreover, "must bear in mind that it is the exclusive function
20 of the jury to . . . draw reasonable inferences from proven facts." *United States v. Rojas*, 554
21 F.2d 938, 943 (9th Cir.1977) (internal quotation marks omitted). A reasonable jury may have
22 inferred that defendant acted willfully precisely *because* he provided the IRS with multiple,
23 conflicting stories about where he got his tax advice. The facts summarized above support the
24 jury's finding.
25 Defendant's Rule 29 motion is **DENIED**.
26 **2. DEFENDANT'S RULE 33 MOTION.**
27 A court may grant a motion for a new trial "if the interest of justice so requires." Fed. R.
28 Crim. P. 33. A motion for a new trial "should be granted only in exceptional cases in which

6

the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (internal quotation marks omitted).

*First*, defendant argues that an error in the undersigned's instructions to the jury necessitates a new trial. During deliberation, the jury asked the following question in a written note to the Court: "Can we consider the statute of limitation brought up in the cross of S.A. Schutz. The discussion in cross was that the extension allowed for 2017 to be processed" (Dkt. No. 105). As defendant tells it:

> Over objection, the Court responded that there was no statute of limitations issue. *This prevented the jury from considering the testimony at all.* The cross-examination testimony regarding the expansion of the investigative statute of limitations was intended to focus the jury on the bias which RA Schutz brought to the investigation and to cast doubt as to the credibility of his testimony. By instructing the jury in the manner in which it did, the Court foreclosed the jury from considering the testimony for this legitimate and relevant purpose.

(Dkt. No. 112 at 6). Defendant's argument is refuted by the record. The Court provided the following instruction to the jury, in open court and after discussion with counsel:

> None of the counts in this criminal prosecution are barred by any statute of limitations. I gave you, in paragraph 15 of the instructions, what the four elements were for each year that the Government must prove. If the Government proves all four for any given year, then your duty would be to convict. If the Government falls short — and when I say "prove," I mean beyond a reasonable doubt. If the Government fails to prove even one element beyond a reasonable doubt for a given year, your duty would be to acquit, meaning not guilty. That's up to you to decide. But in deciding that, you must keep in mind, none of these counts are barred by any criminal statute of limitations. As a matter of law, the statute of limitations for any criminal prosecution is six years.
>
> Now, during the testimony, you heard some testimony that during the audits, there was an extension agreed to to extend a statute of limitations for 2017. The lawyers did not get into the details of what statute of limitations they were talking about, and I'm not going to try to elaborate on what evidence could have been added or subtracted. *You may consider that evidence so that, in terms of you deciding what happened in the audit, if you think any of that evidence bears upon the four elements of proof that have to be proven. You may consider it for that purpose.*
>
> But I tell you as a matter of law that no count in this criminal indictment is barred by any statute of limitations and never was.

7

> Six years goes back further than 2018, when the 2017 return was filed.

(Dkt. No. 117 at 12-13) (emphasis added). It is beyond cavil that the prosecution itself was not barred by the relevant *criminal* statute of limitations. The cabined instruction did not otherwise foreclose on the jury's consideration of RA Schutz's testimony regarding the *administrative* statute of limitations — it acknowledged, *expressly*, that his testimony may be considered insofar as it bears upon the government's proof of the elements.

After the jury returned to their deliberations, the defense objected to the above instruction. The judge then offered to bring the jury back and instruct them that "the statute of limitations that you were talking about was not the criminal statute of limitations. It was for an assessment, a civil assessment, so they could process it for a civil assessment" (*id.* at 14). Defense counsel agreed (*id.* at 15) ("I think, Your Honor, if you would wish to give them that further instruction . . . . It may clear the matter. So if you want to give that instruction, we will not object to that."). The jury was brought back, and a further clarifying instruction was delivered:

> The statute of limitations referred to in the cross-examination pertained to a potentially shorter statute of limitations regarding civil assessment of taxes. It did not pertain to a criminal prosecution or a criminal statute of limitations.

(*Id*. at 17-18). Neither side objected to that clarifying instruction (*id*. at 18).

Defendant's argument fails, *first*, because the initial instruction was cabined and did not foreclose on the jury's consideration of RA Schutz's testimony as it related to the elements of the crime, and *second*, because the later clarifying instruction again underscored that point, as requested by defense counsel.

*Second*, on a separate point, defendant argues that the government committed a *Brady* violation, warranting a new trial. Shortly before trial, the government disclosed an email from Carleen Galetti, then a Special Agent in IRS-CI's San Rafael office, to Stuart Collins, then her Acting Supervisory Special Agent. She wrote, in relevant part:

> I am concerned that we are going out on interviews that shouldn't be conducted. In my opinion, the optics are not good for the IRS

8

> to continue this case based on the facts. While he was initially evasive during the audit interviews, the taxpayer is now being cooperative during the audit process. The TP is willing to pay 2015-2019 back taxes and he doesn't even know that a criminal investigation has been opened. I don't believe the prosecutorial climate here in the Northern District of California supports us continuing this case and sending agents to Sonoma, San Mateo, and San Joaquin Counties while we have limited resources to work the cases that are more promising.

(Dkt. No. 89-1 at 33).

Supervisor Collins replied:

> Carleen, thank you for raising your concerns. [SA] Cas [Mar] has contacted the referring agent for additional information and discuss all the facts of the case with CT Counsel. Based on the complete facts and history, CT Counsel supports us continuing with the criminal investigation.

(*ibid*.). SA Mar, not Galetti, was the IRS-CI agent assigned to defendant's investigation. It is, however, typical for IRS-CI to make simultaneous contact with both the taxpayer and their return preparers or powers of attorney to minimize the risk of collaborative storytelling (Dkt. No. 125 at 43). In this instance, SA Mar contacted several agents — Galetti included — to request help in conducting simultaneous interviews with defendant and his POAs (Dkt. No. 125 at 43-44). SA Galetti did not ultimately participate in any part of the investigation: Her email to Supervisor Collins, sent shortly after she reviewed the summary of defendant's file sent to her by SA Mar, was her only involvement. On April 16, 2021, Agents Kendl Tovey and Lisa Sasso interviewed defendant's POA, Deborah Marion, as SA Mar made first contact with defendant (Dkt. No. 26-1 at 69-73).

SA Galetti, since retired, was examined by both the judge and the parties on the second day of trial, outside the presence of the jury. She testified that she was not assigned to defendant's audit, that she did not recall defendant or his audit, and that she did not recall the email in question. She testified that she did not review any records connected to defendant's audit (beyond those reflected in the email chain at issue) or otherwise participate in the investigation. She retired six weeks after she sent her email to Supervisor Collins. After SA Galetti was excused, the judge stated (outside the presence of the jury):

9

> It does not matter whether somebody in the Government's office thought they had a weak case. What matters is whether or not the jury thinks the evidence actually presented in the courtroom is enough to carry the burden of proof. . . . [O]pinion evidence by someone like this woman that we just saw, Galetti, is so far removed, it is irrelevant . . . . Mr. Stepanian, it's like trying to put the police on trial. You're trying to put the police on trial instead of the defendant, and that's just not the way it works.

(Dkt. No. 116 at 24-25). The undersigned identified a narrow circumstance which may have justified admission of the Galetti email: If the government implied that the taxpayer was not cooperative during the audit process, her comment regarding his cooperation could be admitted (*id*. at 25). That did not come to pass, and Galetti's email and testimony were ultimately excluded.

Defendant argues that the late disclosure of the Galetti email constituted a *Brady* violation warranting a new trial because it (1) prejudiced the defense's "bias" argument at trial (that "the IRS, having designated this a 'training' case, intended this to be a criminal prosecution no matter what Mr. Richardson said or did") and (2) hampered the defense's pre-trial motion to dismiss (arguing that the IRS conducted a criminal investigation under the guise of a civil audit, violating defendant's Fourth and Fifth Amendment rights) (Dkt. No. 112 at 7-8).

"*Brady*'s progeny have articulated three elements that defendants must prove to show a *Brady* violation. *First*, the suppressed evidence must be favorable to the accused. *Second*, the evidence must have been suppressed by the government, either willfully or inadvertently . . . *[T]hird*, the suppressed evidence must be material to the guilt or innocence of the defendant." *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (emphasis added; citations omitted).

*First*, the Galetti email was not favorable to defendant, material to defendant's guilt or innocence, or admissible at trial. What the defense calls a "bias" argument is a selective prosecution argument. Indeed, in his motion *in limine*, defendant described the Galetti email as "*questioning the wisdom of pursuing a criminal prosecution*" and asserted that "there should also be additional documentation *about the decision-making process* that has not been

10

1   disclosed" (Dkt. Nos. 89 at 6, 95 at 1) (emphasis added).  As the undersigned explained during

2   trial, "[i]t does not matter whether somebody in the Government's office thought they had a

3   weak case.  What matters is whether or not the jury thinks the evidence actually presented in

4   the courtroom is enough to carry the burden of proof" (Dkt. No. 116 at 24).  "[I]t is well

5   established that inquiries into why the government chose to investigate and ultimately charge a

6   defendant are irrelevant and thus inadmissible at trial." *United States v. Orrock*, No.

7   216CR00111JADCWH, 2019 WL 1643643, at *2 (D. Nev. Apr. 16, 2019) (Judge Jennifer

8   Dorsey); *United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("A selective-prosecution

9   claim is not a defense on the merits to the criminal charge itself, but an independent assertion

10  that the prosecutor has brought the charge for reasons forbidden by the Constitution.").

The Eighth Circuit, confronted with a similar situation in *United States v. Noske*, held that:

> The court properly excluded evidence that IRS Special Agent Patrick Henry recommended against pursuing prosecution of the Noskes in 1988. Henry did not have the benefit of most of the evidence against the Noskes, which was gathered later, so his 1988 opinion was based on incomplete information and is irrelevant. Even if relevant, the minimum probative value of the evidence is outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury.

*United States v. Noske*, 117 F.3d 1053, 1058 (8th Cir. 1997).  The same is true here.  SA Galetti did not have the benefit of most of the evidence.  Her email, moreover, did not mention defendant's guilt or innocence or the strength of the government's case.  It instead questioned the "optics" of a criminal investigation given the "prosecutorial climate" in our district and advocated for an alternative allocation of prosecutorial resources.  It is a quintessential example of the government's prosecutorial decision-making process at work.  Defendant was not entitled to present evidence of IRS-CI's prosecutorial considerations to the jury.  The Galetti email was not favorable, material, or admissible.

*Second*, the late disclosure of the Galetti email did not prejudice defendant's motion to dismiss (the *Tweel* motion).

United States District Court
Northern District of California

11

The IRS enforces our tax laws through two separate investigative divisions: "IRS Criminal Investigation's (IRS-CI) special agents (SAs) are charged with investigating criminal tax violations, while the IRS's civil arm conducts civil tax examinations (or audits) through revenue agents (RAs)" (Dkt. No. 53 at 2). Most investigations begin as civil audits. Pursuant to the IRS's Internal Revenue Manual (IRM), the discovery of affirmative acts of fraud during a civil audit should trigger a suspension of that audit and referral to IRS-CI for criminal investigation (*ibid.*). IRS-CI may, following their own evaluation of the evidence gathered by the civil auditors, adopt the referral as a criminal investigation or return the matter to the civil team for completion as a civil matter. The transition from civil to criminal within the IRS is an important one, given the evidence gathering that occurs during the civil audit, and the IRM imposes myriad procedural safeguards on such referrals. That procedure is detailed in the undersigned's prior order (*id*. at 2-5). Defendant's *Tweel* motion argued, *inter alia*, that the civil audit team conducted its civil investigation "solely for purposes of advancing the criminal case" against defendant, and "deceived [him] into thinking that no criminal proceedings were contemplated" (Dkt. No. 26 at 7, 13). That argument was rejected (Dkt. No. 53).

In tax cases, "a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent." *United States v. Robson*, 477 F.2d 13, 17 (9th Cir. 1973). "[T]he failure of an IRS agent . . . to warn a taxpayer that [a civil] audit may have potential criminal ramifications does not render the search unreasonable." *Id*. at 17-18. Defendant must produce "clear and convincing evidence of [an] actual deception or trickery on the part of the Government" by way of an "affirmative misrepresentation." *United States v. Bridges*, 344 F.3d 1010, 1020 (9th Cir. 2003).

In *United States v. Tweel*, for example, the defendant's civil audit was initiated at the specific request of the Organized Crime and Racketeering Section of the Department of Justice. 550 F.2d 297 (5th Cir. 1997). *Tweel* held that the RA's assurance, when asked, that no "special agent[s]" were involved in the investigation constituted "a sneaky deliberate deception" in light of the "obvious criminal nature of [the] investigation." *Id*. at 299. Contrast

*Tweel* with *United States v. Stringer*, where the SEC and USAO were conducting parallel civil and criminal investigations of the defendant. 535 F.3d 929, 940 (9th Cir. 2008). There, an SEC attorney saw to it that court reporters did not reveal the then-confidential USAO investigation to the defendant during a civil deposition. *Id*. at 935. When confronted by defense counsel regarding the possibility of the U.S. Attorney's involvement, the SEC attorney stated that "it is the agency's policy not to respond to questions like that, but instead, to direct you to the other agencies you mentioned." *Ibid*. The trial court dismissed the indictment and, in the alternative, suppressed the evidence gathered by the SEC. *Stringer* vacated the dismissal and suppression because the government "made no *affirmative* misrepresentation." *Id*. at 940 (emphasis added). Some courts, meanwhile, have held that the continuation of a civil audit after the discovery of firm indicators of fraud may also constitute a *Tweel* violation (Dkt. No. 53 at 10-14).

Defendant's motion to dismiss failed for several reasons. *First*, defendant was given IRS Notice 609, which advised that information provided during the audit may be used to enforce the criminal tax law (*id*. at 4). RA Schutz, meanwhile, never made *any* affirmative representations about criminal referral (much less a misleading one) (*id*. at 7-10). *Second*, there was nothing to hide: There was no parallel criminal investigation, as in *Tweel* and *Stringer* (*ibid*.). RA Schutz last contacted defendant and his POAs in December 2020; IRS-CI did not become involved until he completed his criminal referral in February 2021, two months later (*ibid*.). *Third*, RA Schutz did not possess firm indicators of fraud during the critical period of the civil audit (August 25 to September 17, after which defendant did not provide any documents or statements to the civil audit team) (*id*. at 11-15).

The defense now argues that the Galetti email "was extremely relevant to *Tweel*," and its timely disclosure would have seen the case thrown out before trial (Dkt. No. 125 at 20, 57-58) ("If we had this material, we would have won the motion."). Not so. The timely disclosure of the Galetti email would not have changed the outcome of defendant's motion to dismiss and would not have necessitated an evidentiary hearing.

*First*, the Galetti email is unrelated to the handling of the civil audit and any representations made to defendant or his POAs during that audit. *Tweel* concerns affirmative misrepresentations made to a taxpayer or his representatives by the *civil* audit team. RA Schutz maintained a detailed "Examining Officer's Activity Record" throughout the course of the civil audit (Dkt. No 26-1). Defendant's audit was transferred to RA Schutz on June 9, 2020 (*id*. at 3). He made first contact with defendant's POA on August 7, 2020 (*id*. at 4). He interviewed defendant twice, on August 26 and September 17 (*id*. at 5-6). He received a single production of documents, on September 11, consisting of "bankruptcy paperwork" and "personal loan documents" (*id*. at 6). RA Schutz had *zero* direct contact with defendant after the September 17 interview, save for an October 19 phone call in which defendant informed Schutz that he had retained a new POA (*ibid*.). His last contact with defendant's POA(s), meanwhile, occurred on December 22: POA Constance Smith inquired, via email, about possible payment plans pending final resolution of the audit (*id*. at 7; 62-63). He completed the criminal referral on February 26, 2021, *more than four months after his last contact with defendant, and more than two months after his last contact with defendant's representatives*. IRS-CI accepted the referral on April 5, 2021 (Dkt. No. 45-2 at 125). The Galetti email, sent on April 14, came two months after the criminal referral and cessation of the civil audit, four months after RA Schutz's last contact with defendant's representatives, and six months after his last contact with defendant. The Galetti email made *no* mention of the civil audit: It concerned IRS-CI's *subsequent*, *separate* decision to adopt the referral and is unrelated to, and would have had no bearing on, defendant's motion to dismiss.

The defense collapses the above timeline to argue that RA Schutz conducted parallel civil and criminal investigations as some sort of double agent:

> And we had access to certain emails which we presented to the Court, and what they show is a pattern where Agent Schutz is continuing to negotiate with the POAs while they're conducting a criminal investigation in the background.

(Dkt. No. 125 at 27).

14

The record contains no such emails. There is *no* evidence of communications between RA Schutz and defendant's representatives after POA Smith's December 22 email exchange, recorded in the agent's activity log. The defense has presented *zero* facts calling into question the veracity or completeness of RA Schutz's activity log. Defendant is aware of any contact he himself had with RA Schutz, RA Schutz testified at trial (and was crossed by the defense for over half an hour), POA Constance Smith testified (and was crossed) at trial, and defendant was free to call any of his other POAs to the stand.

That RA Schutz cooperated with IRS-CI *following* criminal referral does nothing to advance defendant's *Tweel* argument. The Internal Revenue Manual *required* that he do so:

> Within 10 workdays of receipt of the referral, the SA assigned to evaluate the referral will identify the subject (individual or entity under criminal investigation consideration) as the primary investigation (PI), assign a PI number to the case and set up the initial conference. At the 10-day evaluative conference, the referring compliance employee [here RA Schutz], their group manager, the evaluating SA[here, SA Mar], their supervisory special agent (SSA) and the FEA will meet to discuss the referral and review tax returns, evidence gathered to support the alleged offense, criminal tax computations, etc.

(IRM 25.1.3.4).

In sum, everything in the record suggests that RA Schutz and IRS-CI maintained the required separation between the civil audit and the subsequent criminal investigation. RA Schutz followed the IRS Internal Revenue Manual and did not violate it. The Galetti email does not call that — or anything else relevant to the civil audit — into question.

*Second*, the government's late disclosure did not serve to hide some other, yet unknown item of evidence relevant to defendant's *Tweel* motion. The defense argues:

> [W]e don't really know where this information would have led had we been given a timely opportunity to develop it. . . . [W]e couldn't follow up, months before the trial started on whether or not CI was involved in the original civil audit.

(Dkt. No. 125 at 26, 39).

As an initial matter, the Galetti email was sent months after the civil audit's suspension, and did not mention the civil audit or even hint at IRS-CI's involvement in the civil audit. The prospect of SA Galetti's email unraveling misconduct related to the civil audit was always fanciful. The defense, moreover, has now examined RA Schutz, SA Galetti, Supervisor Collins, and SA Mar (twice). They have developed *no* facts suggesting improper collaboration between RA Schutz and IRS-CI. SA Galetti testified, under oath, that she did not participate in defendant's audit. SA Mar testified, at trial, that IRS-CI became involved after RA Schutz's referral. RA Schutz testified, at trial, that he did not know SA Galetti, and that he first met SA Mar "after making the [criminal] referral" (as required by the Internal Revenue Manual). In his declaration in support of the government's opposition to the motion to dismiss, meanwhile, RA Schutz swore that he "did not communicate or otherwise consult with criminal investigators at the IRS regarding the audit or the defendant's tax returns" before the criminal referral (Dkt. No. 35). Supervisor Collins, who remembered little about defendant's case, testified, for what it's worth, that he assigned cases based on availability, and that he did not recall SA Mar indicating prior familiarity with defendant's audit when assigned the referral. The defense has had ample opportunity to pull at this thread, without result. The hope that RA Schutz will renounce his trial testimony and sworn declaration when confronted with an email unrelated to the litigated issue is not a reasonable one, and does not warrant an evidentiary hearing, even now.

To be clear: This order does not bless the government's late disclosure of the Galetti email. The prosecuting attorneys concede that their late disclosure constituted a failure of due diligence. They are right: They should have conducted a thorough, timely examination of SA Mar and his files. They abdicated that duty and left it up to the special agent, who stumbled upon the Galetti email while preparing for trial. Not every failure, however, constitutes a *Brady* violation.

Defendant's Rule 33 motion is **DENIED**.

16

\*            \*            \*

On February 19 the defense filed a renewed request for an evidentiary hearing (Dkt. No. 131). Defendant wants to examine three civil IRS agents: RA Schutz, Fraud Technical Advisor (FTA) Esther Robinson, and General Manager (GM) Nicole Hall (and "other witnesses" that "will come to light as the hearing progresses and these obvious witnesses are examined") (*id.* at 6).

Defendant's motion seems to concede that SA Galetti, her email, and IRS-CI are unrelated to the issues presented in his *Tweel* motion:

> An additional problem with [SA Mar, SA Galetti, and Supervisor Collins's] testimony is that, in large measure, they are the wrong people we should expect to answer the right questions about efforts to procure Mr. Richardson's "cooperation" after his case had bent irrevocably in the direction of a criminal prosecution. *They come mainly from the criminal side of the IRS, when the wrong perpetrated against Mr. Richardson was done by the civil revenue agent and his fraud advisor (FTA) and their supervisors. It was they who kept Mr. Richardson in the dark about his criminal jeopardy while encouraging him, and his representative POAs, to give up damaging documents and information.*

(*id.* at 4) (emphasis added). The motion fails to draw a link between the Galetti email (ostensibly the reason for revisiting *Tweel*) and the requested evidentiary hearing. It instead revives arguments considered, and denied, the first time *Tweel* was litigated. Each is addressed in turn.

*First*, defendant argues that RA Schutz "admitted during the cross examination at trial that he had intentionally gone around the POAs to get to Mr. Robinson [*sic*] himself, from whom Schutz obtained damaging evidence and statements" (*id.* at 5). This argument was considered, and denied, in the Court's *Tweel* order:

> [D]efendant argues that the IRS tricked him when it "deliberately bypassed" his representative — then POA Marion — and "interviewed [him] not once but twice, and [] without the representative being in the middle as a buffer," in contravention of the IRS "Taxpayer's Bill of Rights." Not so. The record shows, and defendant concedes, that POA Marion was in fact present during each of defendant's two interviews conducted on August 26 and September 17, 2020 (Dkt. No. 34-1 at 3-4). Further, the only documents produced to the IRS, on September 11, 2020, were produced through defendant's representative (*ibid*). Nor does the

17

>record suggest that the IRS engaged in a bad faith, albeit unsuccessful, attempt to sideline defendant's representative.

(Dkt. No. 53 at 9). RA Schutz's trial testimony matched the record as it stood when defendant's *Tweel* motion was first litigated. He did not make the "admission" described by the defense. There is still *no* evidence that RA Schutz gathered *any* evidence from defendant without the mediation of a POA.*

*Second*, defendant argues that RA Schutz, at the direction of FTA Robinson and GM Hall, continued the civil investigation despite uncovering firm indicators of fraud by August 25, 2020 (Dkt. No. 131 at 5-6). This too, was considered and denied in the Court's *Tweel* order:

>The IRS did not possess affirmative acts of fraud on August 25, was not required to suspend its civil examination, and consequently did not trick or deceive defendant by continuing its civil examination beyond that date.

(Dkt. No. 53 at 13). Again, defendant points to no new evidence. He instead cites a declaration filed in support of his *Tweel* motion and argues that FTA Robinson's decision "to reinstate 2017 as an audited year even though it had previously been 'surveyed'" evidenced a belief that "clear and convincing evidence of fraud" existed on August 25 (Dkt. No. 131 at 5-6). Again, this was considered and denied in the Court's *Tweel* order:

>[D]efendant asserts that FTA Robinson "knew," on August 25, that "clear and convincing evidence of fraud" existed because she determined that defendant's 2017 tax return was not time-barred due to the applicability of the "fraud statute's" expanded statute of limitations, and instructed RA Schutz to refrain from closing out the examination of that year. However, the record shows that FTA Robinson merely advised RA Schutz to "*[c]onsider* opening prior years under a fraud statute if relevant (*to be considered once more information is known*)" (Dkt. No. 47-1 at 18) (emphasis added). In this instance, the decision to maintain otherwise time-barred examinations pending further investigation did not constitute a determination that fraud in fact *did* exist, only that fraud may yet be established "once more information is known" (*ibid*).

---

* Defendant's motion argues *both* that RA Schutz circumvented defendant's POAs "to get to Mr. Robinson [*sic*] himself," *and* that defendant "was effectively a third party to the negotiations between RA Schutz and his POAs," as is convenient (Dkt. No. 131 at 4-5).

18

1    (Dkt. No. 53 at 14).

2    *Third*, defendant asserts that "*passive*" conduct is sufficient to make out an "*affirmative*

3    misrepresentation" under *Tweel*:

> This requirement should not be interpreted to require that the government broadcast, through some sort of megaphone, false information about the criminal nature of its investigation or to exclude relevant omissions when in context they are intentionally misleading to the taxpayer . . . . Rather, the *Tweel* court emphasized the passive failure of the IRS to truthfully advise the defendant of the true nature of the investigation, with which he was concerned, thereby misleading him while he continued to cooperate.

(Dkt. No. 131 at 6). As an initial matter, defendant misreads *Tweel*. It did not "emphasize[] the passive failure of the IRS" to advise the taxpayer:

> [T]he mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any *acts* by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit and trickery. Therefore, *the record here must disclose some affirmative misrepresentation to establish the existence of fraud*, and the showing must be clear and convincing.

*Tweel*, 550 F.2d at 299 (emphasis added). This was, moreover, considered and denied in the Court's *Tweel* order:

> "Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading." *Robson*, 477 F.2d at 17-18 (emphasis added) (internal quotation omitted). In *Stringer*, where the SEC and USAO *were* in fact conducting parallel civil and criminal investigations, an SEC attorney made sure that, during a civil deposition, the court reporter did not reveal the then-confidential USAO investigation to the defendant, and when asked by defense counsel about the involvement of the USAO, stated that "it is the agency's policy not to respond to questions like that, but instead, to direct you to the other agencies you mentioned." *Stringer*, 535 F.3d at 935. Our court of appeals held that this did not justify dismissal or suppression because the SEC "made no *affirmative* misrepresentation." *Id*. at 940 (emphasis added). Here, of course, there was no parallel criminal investigation, *there was no inquiry* by the defendant, and there was no disclaimer of later criminal referral by the IRS. . . . At bottom, defendant's argument asks that a revenue agent's active pursuit of a civil resolution to a *then civil audit* be deemed an "affirmative" representation regarding the foreclosure of later criminal referral. That outcome would upend the long-extant practice of criminal referral *in toto* and is rejected.

19

(Dkt. No. 53 at 8).

*Finally*, defendant argues that an evidentiary hearing is necessary to learn more about the IRS's document retention and production practices, and to probe the possible existence of further undisclosed emails pertaining to the *civil* audit:

> Embraced in this request is an opportunity to further inquire into the system, or lack thereof, by which the IRS, in tax prosecutions, compiles, maintains and provides to the appropriate AUSAs, important email messages among the IRS agents involved in its civil and criminal investigations and between such agents and affected taxpayers and their representatives.

(Dkt. No. 131 at 6). Defendant describes a fishing expedition. He does not point to any specific facts suggesting that undisclosed emails sent by the civil audit team exist, except dissatisfaction with IRS-CI's general retention, review, and production practices. The thinking is that one email was late disclosed by SA Mar, so surely there must be more from RA Schutz, *et al*. Mere speculation does not warrant an evidentiary hearing.

In sum, defendant's motion treads old ground. An evidentiary hearing was not warranted when these issues were first litigated, and it is not warranted now. The request is **DENIED**.

## CONCLUSION

For the foregoing reasons, defendant's Rule 29 and Rule 33 motions and request for an evidentiary hearing are **DENIED**.

**IT IS SO ORDERED.**

Dated: February 20, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE